**UNITED STATES of America, Appellee,**

v.

**Benjamin G. CANCELMO, Jr., Defendant–Appellant.**

**No. 1322, Docket 94–1552.**

United States Court of Appeals, Second Circuit.

Argued April 21, 1995.

Decided Sept. 1, 1995.

John R. Williams, New Haven, CT, for defendant-appellant.

William A. Collier, Assistant United States Attorney, District of Connecticut, Hartford, CT (Christopher Droney, United States Attorney, New Haven, CT, on the brief), for appellee.

Before: ALTIMARI, JACOBS, and CALABRESI, Circuit Judges.

ALTIMARI, Circuit Judge:

■ Defendant-appellant Benjamin G. Cancelmo, Jr. ("Cancelmo") appeals from a judgment of the United States District Court for the District of Connecticut (Burns, *J.*), convicting him, following a jury trial, of possessing a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and sentencing him principally to fifteen months' imprisonment. Members of the Connecticut Statewide Narcotics Task Force ("SNTF") discovered the firearm during a search of Cancelmo's home for evidence of narcotics trafficking. The basis of the search warrant for Cancelmo's residence was a lengthy affidavit that referred to, among other things, several allegedly "coded" phone conversations between Cancelmo and Eugene Jimenez ("Jimenez"), a known narcotics dealer. According to the affiants, both of whom were members of the SNTF, the conversations indicated that Cancelmo was distributing narcotics with Jimenez, and that evidence of such dealing would be located at Cancelmo's residence.

The district court denied Cancelmo's motion to suppress the fruits of the search, ruling that the affidavit, read in its entirety, including the affiants' interpretations of the phone conversations, supported a finding of probable cause. On appeal, Cancelmo asserts that the district court erred in denying his suppression motion because the interpretations by the SNTF agents were insufficient to establish probable cause to search his home. Because we conclude that the good faith exception to the exclusionary rule applies, we affirm the judgment of the district court.

## BACKGROUND

On February 25, 1993, a Connecticut Superior Court judge issued a search warrant for Cancelmo's person, car, and apartment for cocaine, drug paraphernalia, proceeds, records, and firearms related to narcotics trafficking. The district court relied on a forty-five page affidavit attested to by two Connecticut state troopers, who collectively had twenty years experience, with seven years experience in specialized narcotics investigations. Both officers were members of the SNTF.

The bulk of the affidavit related to Jimenez, providing ample probable cause to believe that he was involved in drug trafficking. The affidavit also contained portions of four conversations between Cancelmo and Jimenez, both of whom are in the construction business. In the first conversation, Jimenez expressed anger about his girlfriend's brother ("Dave"), whom he claimed "owe[d] X amount of dollars for X amount of things." [JA 28]. The affiants interpreted this reference as narcotics-related. In the same conversation, Cancelmo stated, "somebody's lead me on to a chimney. And this other guy supposedly wants to do a full chimney from the foundation up. So you know it's always this guy wants this … it's just a matter of time…." Cancelmo then said, "I'll get in touch with you beginning of this week. See if we can knock half of that out." The affiants interpreted these statements as meaning that Cancelmo had two prospective narcotics purchasers, although he was not cer-

tain when they would be ready to make their purchases. [JA 28–29].

In the second conversation, Cancelmo, speaking from his home phone, stated that he was "waiting on . . . one phone call, it should be a little while." He further told Jimenez that he "[g]ot this one guy, like I told ya, he's end up with a [expletive] beating anyways . . . on top of it," and that there was another "guy [who's] solid ya know. . . ." Jimenez asked Cancelmo "[w]hen do you still work . . . Wednesday, then," to which Cancelmo responded, "Hopefully, I'm waiting for a call today." The affiants interpreted this to mean that Cancelmo was waiting for an order to be placed for narcotics, that he had collected money for narcotics, that he was considering assaulting one person who had not paid off his debt, and that he had proceeds and/or drug records at his apartment. [JA 53–54].

In the third conversation, Cancelmo asked Jimenez, "[A]re you still ready? 'Cause I'm ready." Jimenez responded, "I'm ready man." Cancelmo concluded the conversation by saying, "I gotta talk to you about a couple of things," and "things look good." The affiants interpreted these statements as Cancelmo asking Jimenez if he had any narcotics for sale, and as Cancelmo stating that he had several potential customers to whom he wanted to sell as soon as possible. [JA 55].

In the last and longest conversation, Cancelmo told Jimenez that he needed to talk to him, although he did not elaborate. Jimenez told Cancelmo that he was going to "the city" with "Dave and his associate." Although Cancelmo wanted to go as well, he stated "I ain't bringing them with me," and later asked Jimenez to "get rid of them," apparently because of his distrust of Dave. The following conversation ensued:

> Jimenez: Hey uhmm . . . does ah, let's see, how can I word this. Crash something Dave says. You know what you do? Hey.
>
> Cancelmo: Yeah.
>
> Jimenez: Grab somebody from somebody's . . . pants there.
>
> Cancelmo: Nahh. It's, it's, forget about it.
>
> Jimenez: Forget about it.

> Cancelmo: Nah. Not even a chance.
>
> Jimenez: Yeah. Allright.
>
> Cancelmo: Beat to [expletive].

[JA 57]. The affiants interpreted this conversation to mean that Cancelmo wanted to meet with Jimenez to discuss narcotics and to finalize a purchase of cocaine, and that Cancelmo wanted to go to New York City to purchase narcotics but did not want Dave to come because he did not trust him. As to the quoted dialogue, the affiants stated that Jimenez had asked Cancelmo to acquire a small amount of cocaine at the bar from which Cancelmo was calling, although Cancelmo refused because of the poor quality of available cocaine. [JA 56–58]. Shortly after this conversation, agents observed Cancelmo arrive at Jimenez's house in his Cadillac and depart soon thereafter. The following day, agents observed both Cancelmo's Cadillac and Jimenez's automobile parked in front of Cancelmo's residence.

The affidavit also refers to several other allegedly coded conversations. For example, one confidential informant stated that in arranging narcotics transactions over the phone, he and Jimenez often used a code involving lumber. [JA 19]. More specifically, during a monitored conversation, the informant told Jimenez that he wanted "to do that deck with you." [JA 23]. In another recorded conversation, Jimenez asked the informant about his "agenda" for the day, which the informant indicated was an inquiry as to when the informant could buy cocaine. [JA 35]. The only alleged code words common to both the conversations between Jimenez and Cancelmo and between Jimenez and others were "things" (allegedly referring to narcotics) and the "city" (allegedly referring to New York City).

Upon executing the warrant at Cancelmo's residence, SNTF agents did not discover any evidence of narcotics trafficking, but did seize a sawed-off shotgun, a carbine rifle, a brass knuckles-style knife, and ammunition for a .22 caliber firearm. At some time during the investigation, SNTF agents also learned that Cancelmo previously had been convicted of a felony. The government charged Cancelmo in a one-count indictment with possessing a firearm as a convicted fel-

on, in violation of 18 U.S.C. § 922(g)(1). Cancelmo moved to suppress the evidence seized from his residence on the ground that the SNTF agents' interpretations of his conversations with Jimenez did "not even remotely suggest probable cause" to believe that Cancelmo was dealing narcotics. The district court denied the motion, noting that the agents' reasonable interpretations of the conversations were entitled to substantial weight in determining whether probable cause existed. Moreover, the district court deferred to the agents' opinion that evidence of narcotics trafficking likely would be found in Cancelmo's residence, his car, and on his person. Cancelmo was convicted following a jury trial and sentenced to fifteen months' imprisonment. He now appeals.

## DISCUSSION

Cancelmo's only contention on appeal is that the district court should have granted his motion to suppress the firearms seized from his residence on the ground that the interpretations of the SNTF agents, standing alone, could not support a finding of probable cause. Although he acknowledges that a court may consider the opinions of experienced officers in analyzing probable cause, Cancelmo claims that a search warrant cannot issue solely on such opinion evidence. The government argues in response that there was sufficient information in the affidavit, including the allegedly coded conversations, to link Cancelmo to criminal activity. Even if probable cause did not exist, the government contends, this Court should uphold the admission of the seized evidence under the good faith exception to the exclusionary rule articulated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Although we recognize that the question of whether probable cause existed in the instant case is a close one, we need not resolve the issue because we conclude that the good faith exception applies. *See, e.g., United States v. Moore,* 968 F.2d 216, 222 (2d Cir.) (declining to decide issue of probable cause and relying instead on good faith exception), *cert. denied,* —— U.S. ——, 113 S.Ct. 480, 121

L.Ed.2d 385 (1992); *United States v. Fama,* 758 F.2d 834, 835 (2d Cir.1985) (same).

■ Evidence seized pursuant to a warrant for which actual probable cause does not exist or which is technically deficient is admissible if the executing officers relied on the warrant in "objective good faith." *Leon,* 468 U.S. at 923, 104 S.Ct. at 3420 (test of objective good faith is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization"). The essential rationale underlying the good faith exception is that the exclusionary rule "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity." *Id.* at 919, 104 S.Ct. at 3418.

■ There are four situations in which the good faith exception is inapplicable, that is, where an executing officer's reliance on a warrant could not be in good faith:

(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Moore,* 968 F.2d at 222 (citing *Leon,* 468 U.S. at 923, 104 S.Ct. at 3421).

Cancelmo argues that the application supporting the warrant contained simply a "bare bones" affidavit lacking any objective facts linking him with criminal activity. *See, e.g., Moore,* 968 F.2d at 222. In the absence of any information other than the allegedly coded conversations, Cancelmo argues, the officers acted objectively unreasonably by relying on the warrant because it was wholly "lacking in indicia of probable cause." *Id.*

We disagree. Error, if any, in the issuance of the warrant is attributable to the magistrate who determined that the facts as alleged by the agents established probable cause. The affidavit in support of the warrant application contained sufficient information to render the agents' reliance on the magistrate's authorization reasonable. The affidavit revealed: (1) that Cancelmo had arguably suspicious conversations with Jime-

nez, a known narcotics dealer, which the agents interpreted as narcotics-related; (2) that Jimenez used coded language, such as references to "decks" and "lumber," in other conversations that a confidential informant explained were narcotics-related; (3) that Jimenez's automobile was observed at Cancelmo's house the day following an alleged trip the two took to New York City to purchase narcotics; and (4) that the agents believed, based on their experience, that evidence of the drug trafficking activity might be present in Cancelmo's residence, given that Cancelmo indicated that he was awaiting a phone call at his residence allegedly regarding a narcotics transaction. Although these facts alone might not establish probable cause, when "viewed in their totality [they are] fully consistent with an objectively reasonable belief" by the executing agents that the warrant was valid. *See, e.g., Fama,* 758 F.2d at 838.

■■■ Application of the good faith exception is particularly appropriate in the instant case because the legal question of whether probable cause existed is a close one. Under federal law, a search warrant is properly issued if a neutral magistrate finds that, under the totality of the circumstances, probable cause exists to believe that a crime has been committed and there is a fair probability that the premises will yield the objects specified in the search warrant. *See United States v. Travisano,* 724 F.2d 341, 346 (2d Cir.1983). "The fact that an innocent explanation may be consistent with the facts as alleged ... will not negate probable cause." *Fama,* 758 F.2d at 838.

We have noted that drug dealers rarely speak openly about their trade; instead, they often engage in a so-called "narcotics code." *United States v. Sisca,* 503 F.2d 1337, 1343 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974). Use of such a narcotics code is certainly "supportive of a probable cause finding." *United States v. Feola,* 651 F.Supp. 1068, 1096 (S.D.N.Y.1987) (quoting *United States v. Fury,* 554 F.2d 522, 530–31 (2d Cir.), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2978, 53 L.Ed.2d 1095 (1977)), *aff'd,* 875 F.2d 857 (2d Cir.), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989).

We have, however, never explicitly addressed whether the use of an alleged narcotics code can provide the sole basis for the issuance of a warrant.

There are several reasons to refrain from adopting such a rule. Where a magistrate relies solely on the opinion of an agent as to the true meaning of facially innocent words, there may be an abdication of the judicial role by the magistrate. Absent evidence corroborating a suspect's involvement with narcotics, the magistrate's determination is entirely dependent upon the interpretations of those individuals enforcing the law. A finding of probable cause might rest solely on the fact that an individual in a recorded conversation speaks in an incoherent manner and makes ambiguous statements that an agent interprets as narcotics-related. Where, as here, one of the parties to the conversation is a known drug trafficker, the potential exists for agents to interpret even the most innocuous statements as narcotics-related, simply because they were spoken by or to a drug dealer. *See, e.g., United States v. Burke,* 718 F.Supp. 1130, 1137 (S.D.N.Y.1989) (noting the concern about "agents turning themselves into instant experts on any subject").

On the other hand, the agents' interpretation of the conversations arguably established probable cause, even in the absence of other corroborative facts. Although the conversations may have had an innocent meaning, it can hardly be said that the agents' interpretations were unreasonable or implausible. *See Fury,* 554 F.2d at 530–31 (intercepted conversations, although "somewhat ambiguous at times, can be reasonably interpreted to indicate what the detective interpreted them to be"). Moreover, these conversations were not randomly intercepted; instead, they were part of an ongoing investigation of a known drug dealer who, according to a confidential informant, used code words such as "decks" and references to lumber when arranging narcotics transactions. Understood in this context, the conversations, which at points appear cryptic even to an untrained ear, arguably support a finding of probable cause.

In summary, although we are skeptical of the government's claim that probable cause

existed, we need not resolve the close legal question presented. In a case such as this one, "a reasonably well-trained [agent] could not be expected to know that the warrant issued" by the magistrate was invalid. *United States v. Buck*, 813 F.2d 588, 593 (2d Cir.) (noting that the "exclusionary rule's deterrent function is not served by penalizing officers who rely upon the objectively reasonable legal conclusions of an issuing judge"), *cert. denied*, 484 U.S. 857, 108 S.Ct. 167, 98 L.Ed.2d 121 (1987); *see also Leon*, 468 U.S. at 921, 104 S.Ct. at 3419 ("In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient."). Given that the issue presented is sufficiently difficult as to "create disagreement among thoughtful and competent judges," *see Fama*, 758 F.2d at 838 (quoting *Leon*, 468 U.S. at 926, 104 S.Ct. at 3422), we decline to hold that the agents acted unreasonably in accepting the magistrate's legal conclusion that probable cause existed. Requiring suppression in this case "would disserve the deterrent function of the exclusionary rule." *Fama*, 758 F.2d at 838. Accordingly, regardless of whether probable cause actually existed to support the search warrant, we conclude that the district court did not err in declining to suppress the seized firearms, on the basis of the good faith exception.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the district court.

CALABRESI, Circuit Judge, concurring:

I agree with the majority that this case may properly be resolved under the good faith exception to the exclusionary rule, and so I concur. I write separately because, unlike the majority, I would reach the question of whether probable cause to issue the warrant existed in this case and would conclude that it did not.

*United States v. Moore*, 968 F.2d 216, 222 (2d Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 480, 121 L.Ed.2d 385 (1992), demonstrates that we may decline to decide the probable cause question in cases in which the good faith exception applies. That procedure, however, should be used only when the court is genuinely uncertain about whether probable cause exists. Courts of appeals are the final deciders of the law in the vast majority of cases of this sort. This means that we owe a duty to define the boundaries of probable cause, so that affiants submitting applications for warrants, issuing magistrates, reviewing courts, and the executing officers on whose good faith we rely may have appropriate guidance. And these boundaries are best set, not by abstract statements, but by case-by-case decisions in real situations.

In this case, there was no probable cause. The supposedly coded conversations are fully consistent with the conduct of legitimate business. Cancelmo was employed in construction, and conversations about decks and chimneys are natural for one in that line of work. The idea that the parties were talking in code rests on very little more than a prejudgment, not itself based on probable cause, that since one of the parties was, on reliable information, a drug dealer, they had to be talking about drugs. But in deciphering a possibly coded conversation to evaluate probable cause to search one party's premises, the code key cannot be supplied simply by the fact that the *other* party is a drug dealer. Even drug dealers engage in some legitimate transactions. The prosperous ones may put decks and chimneys on their houses. The fact that drug dealers buy things from people outside the trade means that such outside people will at times talk with drug dealers, and do so unknowingly. But talking to a drug dealer does not, by itself, make one's home subject to search.

I do not suggest a *per se* rule under which intercepted conversations, alleged to be in code, could never, standing alone, give rise to probable cause. There may be conversations that are so incoherent, or in which the choice of words is sufficiently implausible, that they give rise to probable cause to believe that the terms used were merely a subterfuge to disguise a conversation about drugs. But while the conversations intercepted in this case include a fair amount of stammering and rambling speech, there is nothing inherently

**810**

illogical about them. They are in fact not that different from many a conversation between a hapless customer and an earthy building contractor. In the absence of evidence that more directly tied Cancelmo, and not the person with whom he was speaking, to drug-related activity, it was improper for the magistrate to issue a warrant in reliance on the intercepted phone calls.

Judge Jacobs, who would not reach the issue of probable cause for a variety of reasons, nevertheless is of the view that there was no probable cause for the reasons I have stated.

Because I agree with the majority's analysis of the good faith exception, I concur in the majority's opinion on that issue and in the result that the majority reaches.