**UNITED STATES of America,
Plaintiff,**

v.

**Carmine AGNELLO, et. al., Defendant.**

**No. 00 CR 205(NG) (RML).**

United States District Court,
E.D. New York.

Aug. 13, 2001.

Bridget Rohde, Andrew Genser, Gregory Paulides, Assistant U.S. Attorneys, E.D.N.Y., Brooklyn, NY, for plaintiff.

Marc Fernich, (Head Atty.), New York City, Scott E. Leemon, Benjamin Brafman, Charles S. Hochbaum, Alan Futerfas, Ellen Resnick, Pater E. Quijano, Robert Katzberg, New York City, Barry G. Rhodes Joel Walter, Brooklyn, NY, Gary Schoer, Syosset NY, for defendants.

### ORDER

GERSHON, District Judge.

Upon review of the Report and Recommendation of Magistrate Judge Robert M. Levy dated July 20, 2001, recommending denial of the defendants' motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and to suppress electronic surveillance evidence, and no objections having been filed (other than a letter on behalf of defendant Steven Scala that he joins in any objections filed by co-defendants, none of which were made), Judge Levy's Report and Recommendation is adopted as the Order of this Court.

**SO ORDERED.**

### *REPORT AND RECOMMENDATION*

LEVY, United States Magistrate Judge.

The Honorable Nina Gershon, United States District Judge, referred this matter to me for a report and recommendation on defendants' motion for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and to suppress electronic surveillance evidence. For the reasons stated below, I respectfully recommend that defendants' motion be denied.

### BACKGROUND AND FACTS

Defendant New York Shredding Corp., on behalf of all defendants jointly,[1] brought this motion on March 23, 2001 pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), and its progeny, alleging that the May 3, 1996 application supporting the third extension and first amendment of a New York State eavesdropping warrant for the telephone of Charlie Marino at Marino's Auto Salvage, located at 150–10 Beaver Road, Queens, New York (the "Marino telephone"), lacked probable cause because it contained " 'reckless omissions or false statements.' " (Memorandum of Law in Support of Defendants' Joint *Franks* Mo-

---

1. Defendants Carmine Agnello, Michael Agnello, John Sowulski, Joseph Burger, Debra DeCarlo, and Mark Lomanaco have all joined in this motion. (*See* Letter of Robert Katzberg, dated April 13, 2001; Letter of Alan S. Futerfas, dated April 11, 2001; Letter of Francis J. Murray, dated April 11, 2001; Letter of Joel S. Walter, dated March 30, 2001; Letter of Gary Schoer, dated April 30, 2001; and Letter of Charles S. Hochbaum, dated May 2, 2001.)

tion to Suppress Electronic Surveillance Evidence ("Dfts.' Mem."), at 2–3 (quoting *United States v. Miller*, 116 F.3d 641, 664 (2d Cir.1997))). Defendants request a *Franks* hearing and seek to suppress all of the electronic surveillance in this case. I heard oral argument on May 24, 2001.

On February 6, 1996, the New York City Police Department's Queens County District Attorney's Squad (the "QDA Squad") obtained an eavesdropping warrant for the Marino telephone in order to investigate an alleged "chop shop" operation. (Dfts.' Mem. at 2–3; *see also* Government's Memorandum of Law in Opposition to Defendants' Motion for a *Franks* Hearing and to Suppress Electronic Surveillance Evidence, dated April 23, 2001 ("Govt's Mem.") at 2.) [2] The QDA Squad sought these communications relating to the crimes of Falsifying Business Records in the First Degree, Offering a False Instrument for Filing in the First Degree, Grand Larceny in the Third and Fourth Degrees, and Criminal Mischief in the Second and Third Degrees. (*See* Application of Richard A. Brown, dated February 6, 1996.) [3] Detective Cary Brenner of the New York Police Department testified that the CI had informed him that Marino's "is a business which distributes used vehicle parts many of which have been removed from stolen vehicles or from vehicles which are the subject of 'insurance jobs' either at 'Marino's' or at chop-shops located elsewhere." (Brenner Aff. I ¶ 20.) Insurance jobs involve collusion between a vehicle owner and a vehicle dismantling enterprise, whereby the owner falsely reports the vehicle was stolen but, in order to collect insurance proceeds, in reality delivers it to a vehicle dismantler. (Brenner Aff. I ¶¶ 14–18.)

Although Carmine Agnello ("Agnello") was not named as a target in the initial eavesdropping warrant, the warrant application contained information about Agnello and his alleged involvement with the Marino enterprise. (Govt. Mem. at 10.) A pen register order revealed five telephone calls from the Marino telephone to and from Jamaica Auto Salvage, Inc. and ten telephone calls made to and from Jamaica Auto Salvage II. Agnello owned both businesses. (Brenner Aff. I ¶ 35b-c.) [4] Further, Detective Brenner noted that years earlier Agnello had been charged with grand larceny in the second degree, criminal possession of stolen property in the first degree, possession of burglar tools, and unauthorized use of a motor vehicle, but pleaded guilty in 1984 to possession of

2.  In Detective Cary Brenner's affidavit in support of this warrant he noted that although the subject telephone was registered to Marino's Auto Salvage located at 150–10 Beaver Road, surveillance and information provided by a Confidential Informant ("CI") indicated that the telephone was located inside Beaver Auto Parts, located at 150–06 Beaver Road. Dunn and Bradstreet records list Loretta Marino, the sister of Charlie Marino, as the owner of Beaver Auto Parts, and N.Y.S. Department of Motor Vehicles records also list Loretta Marino as the owner of Marino's Auto Salvage. (*See* Affidavit of Cary Brenner, dated February 6, 1996 ("Brenner Aff. I"), ¶ 3 n. 2, annexed as Ex. B to the Affidavit of Marc Fernich, sworn to March 23, 2001 ("Fernich Aff.").) Marino's Auto Salvage and Beaver Auto Parts, together, will hereinafter be referred to as "Marino's."

3.  The initial application for the eavesdropping warrant was based on the affidavits of Assistant District Attorney Bill Gianaris and Detective Cary Brenner.

4.  A pen register of another telephone line listed to Beaver Auto Parts, the Marino business located at 150–06 Beaver Road, also intercepted sixteen telephone calls to and from Jamaica Auto Salvage and Jamaica Auto Salvage II, both Agnello businesses, and one telephone call to Agnello Auto Parts, which a check with Dunn and Bradstreet revealed to be owned by Agnello, as well. (Brenner Aff. I ¶ 35e, n. 19.)

burglar tools, resulting in a fine and a conditional discharge. In addition, in 1985 Agnello was convicted after a trial of criminal possession of stolen property in the second degree, possessing an unregistered vehicle dismantler (a class E felony pursuant to Section 415–A of the Vehicle and Traffic Law), and two counts of vehicle dismantler registration violations (a class A misdemeanor pursuant to Section 415–A of the Vehicle and Traffic Law). However, only the misdemeanor charges involving vehicle dismantler registration violations were upheld on appeal.[5] (Brenner Aff. I ¶ 35b.) Detective Brenner declared: "I know Carmine Agnello to be in control of vehicle dismantling operations where stolen vehicles are being dismantled and parts being distributed to numerous auto body repair shops through previous investigations I have conducted." (Brenner Aff. I ¶ 35b.) Brenner further stated that "it is believed that MARINO works under Carmine Agnello in this vehicle theft and illegal vehicle dismantling enterprise (based upon information provided by the CI and investigations I have conducted in the past)." (*Id.* ¶ 42.) [6]

In preparing the initial application, Detective Brenner relied on information provided by a confidential informant ("CI"). The CI told Detective Brenner of Marino's involvement in the vehicle dismantling enterprise and Agnello's involvement in criminal activity. (Brenner Aff. I ¶ 21; 35b). The CI informed the detective of his own personal involvement in criminal activity directed by Agnello. (*Id.* at ¶ 35b.) [7]

---

**5.** Agnello also pled guilty in 1994 to criminal mischief in the fourth degree. (Brenner Aff. I ¶ 35b.)

**6.** Detective Brenner described a conversation on February 26, 1996 between Agnello and Marino as showing that Marino " 'work[ed] under Agnello in this vehicle theft and illegal vehicle dismantling enterprise.' " (Govt's Mem. at 12 (citing March 1996 Brenner Aff.).) The conversation between the two men was as follows:

| | |
|---|---|
| Carmine Agnello | Alantra's [phonetic] over there. This is third time I'm talking to Richie. I told him nicely. I said when my workers come down there. Please do not take my workers, to work. |
| CA | If he wants to take money off my table, I promise him I take a lot of money off his table. |
| Charlie Marino | Okay. |
| CA | You just tell him that when my workers come there out of respect to the junkyard business, and respect to me, just send them away. But he does it on a sneak. |
| CM | No problem. |
| CA | [Inaudible] week. But next time. |
| CM | Who is it, Alantra? |
| CA | Yeah, Alantra. I'm gonna go down there, I'm gonna split Richie's head right open. On my fucking son, I'm gonna split his head right open, and I'm gonna burn his whole place down. |

(Govt's Mem. at 12–13 (citing March 1996 Brenner Aff. at 23.).) The rest of the conversation included statements such as, "If he wants to play with me, I fuckin swear, I swear on your daughter I will go down there and split his head with a baseball bat," and "[t]he next time he fuckin does it, I don't give a fuck who he's with, I'm gonna go down there and split his head open and [inaudible] I'll take money off of his table. Take my word for it." (Govt's Mem. at 13.) Detective Brenner described this conversation as demonstrating Agnello's violent nature and his exertion of control and influence over rivals in the automotive parts business. (*Id.*)

**7.** The CI also informed Detective Brenner "that he knows Carmine Agnello to be the owner of Jamaica Auto Salvage." (Brenner Aff. I ¶ 35b.)

Based in part on information provided by the CI, Detective Brenner knew that Agnello controlled numerous illegal vehicle dismantling operations, that Marino worked under Agnello in these operations, that Debra DeCarlo ("DeCarlo") worked for Agnello conducting a majority of the daily activities for his illegal dismantling enterprises, and that DeCarlo moved into the building at 150–06 where Marino's was located. (*Id.* ¶ 42; Affidavit of Cary Brenner, dated May 3, 1996 ("Brenner Aff. II"), ¶ 29, annexed as Ex. C to the Fernich Aff.) [8] The CI also informed Detective Brenner that he had been involved in the Marino criminal enterprise. (Brenner Aff. I ¶ 21.) [9]

Marino had admitted to the CI that he replaced VIN number plates on stolen vehicles with VIN numbers from salvaged vehicles, and the CI had been present when Marino told a person who delivered "insurance job" vehicles that the owner could report the vehicle stolen once the car had been dismantled. (*Id.* at ¶ 22.) More-

8. Additionally, based in part on information provided by the CI Detective Brenner knew that Agnello opened a scrap yard named Scrap Metal Processing, Inc. located at 155–11 Liberty Avenue, Jamaica, NY. (Brenner Aff. II ¶ 31.)

9. On previous occasions, including instances involving insurance jobs at Marino's, Detective Brenner had confirmed the CI's reliability by corroborating the CI's information. (*See* Brenner Aff. I ¶¶ 23–27.) For example, the detective independently corroborated the CI's information that "insurance jobs" were to be delivered to Marino's by conducting surveillance. (*Id.* ¶ 28–29.) On two occasions he observed "the vehicle as described by the CI enter 'Marino's' yard." DMV and police records indicated that the vehicles were reported stolen by the owners six and ten days after Detective Brenner observed them at Marino's. (*Id.* ¶ 29.) Detective Brenner stated that during tape-recorded telephone conversations between Marino and the CI.

> Marino and the CI specifically discussed the delivery of vehicles to "Marino's." Based upon the context of their conversations, which included the prices to be paid for the delivery and the acquisition of the vehicles and other aspects regarding the delivery and the conditions of the vehicles, it is clear to me, based upon my experience and expertise in the field of vehicle theft and illegal dismantling enterprises, that they were discussing "insurance job" vehicles. Moreover, one of the above-mentioned "insurance job" vehicles which I observed being delivered into "Marino's" was specifically discussed.

(*Id.* ¶ 30.) Detective Brenner further testified that he knew the two to be discussing "insur-

ance jobs" because the agreed upon price was lower than market value. (*Id.* ¶ 30, n. 13.) On January 16, 1996 at approximately 9:30 p.m. Detective Brenner observed a dismantled 1992 grey Lexus parked across the street from Marino's. Detective Brenner testified that

> I had the opportunity to observe said Lexus from a close distance at night while no one was in the vicinity and observed that the public VIN on said Lexus vehicle had been removed. I also looked into the trunk of said vehicle (which had no trunk lid on it) and recovered from the trunk of said vehicle, an envelope with "Marino's Auto Salvage" stamped in the upper left-hand corner and with the address and telephone number for "Marino's" listed underneath it

(*Id.* ¶ 31.) There was also paperwork for a 1993 Dodge Shadow which had typed "shipped to J. Spinelli Auto Parts" with an address. The CI informed Detective Brenner that "J. Spinelli" is John Spinelli, Carmine Agnello's uncle. (*Id.* ¶¶ 31, 31 n. 15.) Detective Brenner also recovered an invoice for repairs to a 1992 Lexus LS400 with VIN number JT8UF11E3N0128836 which, after checking with the DMV New York State Police Information Network, belonged to a Lexus that had been reported stolen on January 15, 1996. (*Id.* ¶ 31–32.) On January 17, 1996, Detective Brenner observed an unknown male make numerous trips from the Lexus to Marino's removing parts and bringing them to "Marino's." He observed Marino talking to this unknown male during this time period. (*Id.* ¶ 33.) The next day the car was gone. (*Id.* ¶ 34.) The pen register of the Marino telephone revealed telephone calls from Marino's business to J. Spinelli. (*Id.* ¶ 35d.)

over, the CI had engaged Marino in tape-recorded telephone conversations regarding the illegal vehicle dismantling business. (*Id.* ¶ 21; 30.)

In his affidavit, Detective Brenner explained that he had been a police officer with the New York City Police Department ("NYPD") for twenty-two years and a detective since 1990 with extensive training and experience in illegal dismantling investigations.[10] (Brenner Aff. I ¶ 4.) Detective Brenner concluded that

> [a]s a result of all of my training as well as my experience in conducting investigations of illegal vehicle dismantling activity, I am familiar with the manner in which an illegal vehicle dismantling enterprise operates and I am also familiar with many of the words and phrases used by participants in illegal vehicle dismantling activity when they discuss the operation of such an illegal enterprise.

(*Id.* at ¶ 8.)

On May 3, 1996, the QDA sought to extend the thirty-day eavesdropping warrant for the third time and to amend it to include Carmine Agnello and Debra De-Carlo as targets of the investigation. The application also sought to amend retrospectively the eavesdropping warrant in order to preserve the use of certain communications as they related to computer trespass-related crimes. (Application of Richard A. Brown, dated May 3, 1996 ("Brown App.") .) The application for the third extension and amendment of the eavesdropping warrant incorporated by reference the original eavesdropping warrant, the first and second extensions, and the applications and affidavits in support thereof. (Affidavit of Bill Gianaris, dated May 3, 1996, ¶ 5.) On May 3, 1996, Justice O'Brien granted the application in full and ordered interception of telephone calls at the Marino telephone for an additional thirty days. (See Order dated May 3, 1996 annexed as Ex. C to Fernich Aff.) It is this extension that defendants contest.

The May 3, 1996 extension included the affidavit of Detective Brenner, which explained that previous wiretaps had intercepted several conversations regarding the illegal use of an NYPD computer to run license plates. (Brenner Aff. II ¶ 27.) For example, in a conversation intercepted on April 26, 1996, Macarthur Perry, an employee at "Marino's," informed Marino that Agnello "wanted to check a plate." (*Id.*) Marino responded, "Okay, you take care of it for him?" and Perry answered "[inaudible] Jackie in the office, got to wait till she gets back." (*Id.*) Later in the day Marino had a conversation with a woman identified as Perry's wife, NYPD officer Jacqueline Scruggs, in which he provided her with the license plate number "E104YK." (*Id.;* Govt's Mem. at 16.)

Later that same day, in an intercepted call from Agnello to Marino, Agnello inquired, "Charlie, that number I gave that guy did he get anything yet?" and Marino responded "I didn't get it back yet," at which point Agnello provided Marino with another license plate number, "E855MJ." (Brenner Aff. II ¶ 27.) About an hour

---

**10.** For six years Detective Brenner was assigned to the NYPD's Organized Crime Control Bureau Auto Crimes Division ("ACD"), with two years of that time at the Joint Auto Larceny Task Force of the FBI and NYPD. (Brenner Aff. I ¶ 4.) Detective Brenner completed a four-day course given by ACD that analyzed the manner in which illegal vehicle dismantling enterprises operate. (*Id.* ¶ 5.) As of February 1996 he had participated in over twenty vehicle theft and illegal dismantling investigations resulting in over seventy arrests. (*Id.*) He was also involved in the execution of over forty search warrants which authorized the search of chop-shops. Detective Brenner was the affiant for approximately fifteen of these warrants. (*Id.* ¶ 7.)

later Marino called Scruggs and asked "you run those plates for me?" to which Scruggs responded "I got no hit on that plate." Scruggs then said that if there was no hit, then the plate belonged to a cop. (*Id.*) Marino then gave Scruggs the "E855MJ" plate provided by Agnello an hour earlier. (*Id.*) Based on these telephone conversations, Detective Brenner concluded that

> it is evident that MARINO, PERRY, AGNELLO AND SCRUGGS are all using the subject telephone line in furtherance of the commission of the crimes of computer trespass and unauthorized use of a computer by knowingly using a N.Y.C. Police Department computer to run license plate numbers in furtherance of an illegal vehicle theft and dismantling enterprise. Based on my expertise, I can conclude that the reason for running plate numbers in this instance is to determine whether "insurance job" or stolen vehicles have been reported stolen yet or to determine whether there is an undercover police vehicle in the vicinity.

*Id.*

As noted earlier, according to information from the CI, surveillance of Marino's, and intercepted conversations over the Marino telephone, Debra DeCarlo moved into the building located at 150–06 Beaver Road where Marino's business was located and set up a telephone line. (*Id.* ¶ 29.)

Agnello's business, Jamaica Auto Salvage, was located around the block from Marino's. (*Id.*) Detective Brenner noted that "there were . . . numerous conversations intercepted over the subject telephone line involving Carmine Agnello and his employee, Debbie Decarlo." (*Id.*) [11] Further, "[d]uring these conversations between Agnello and Decarlo, Agnello and Decarlo are constantly discussing the running of Agnello's businesses, including his illegal vehicle dismantling operation on one occasion." (*Id.*) [12]

Detective Brenner testified that "[o]f particular interest is a telephone conversation" recorded on April 8, 1996 between Agnello and DeCarlo which is set forth as follows:

CM  Charlie Marino

CA  Carmine Agnello

D   Debbie DeCarlo

CA  Where is she?

CM  Hold on a second

D   Hello

CA  Yeah, what's the matter?

D   Listen to me, I already called about the rent, he don't want to hear it, he'll talk to you and hung up on me. I told Junior about the rent. He told me that you said he don't ever have to pay rent there

CA  No, no, no, no, they all gotta pay rent. He didn't pay me this month

D   But that's what I told him

(*Id.*) Further corroboration was provided by information from the CI, Brenner's past experiences, and conversations intercepted over the Marino telephone. (*Id.*)

11. Detective Brenner reiterated his statement from the original warrant affidavit that Agnello controlled numerous illegal vehicle dismantling operations, Marino was part of the operation that Agnello was operating, and DeCarlo was working for Agnello and conducting the majority of the day-to-day business activities and vehicle dismantling operations. (Brenner Aff. II ¶ 29.) Brenner testified "[t]his is corroborated by conversations between MARINO and Agnello intercepted over the subject telephone line, which conversations are discussed below in my affidavit."

12. In addition, Detective Brenner said that the wiretap intercepted conversations between Agnello and Marino in which the two discussed Agnello's illegal vehicle dismantling operations and his scrap yard business. (*Id.* ¶ 29.)

CA  Everybody pays rent

D  I know that

CA  I'll call him right now

(*Id.* ¶ 30.) Detective Brenner testified that he understood, based on his expertise and prior experience, that the term "rent" was used to discuss the monthly payment Agnello collected from owners of various businesses who operate illegal vehicle dismantling operations under Agnello's control. (*Id.*) Then, on April 11, 1996, Marino and Agnello had the following conversation:

CM  You want Alliance and Glen Cove?

CA  Yeah, why not?

CM  No problem, let me give them a call

CA  Where's Debbie at?

CM  Hold on a minute, she's gotta be upstairs. I gave Chris an envelope for you for the rent.

(*Id.* ¶ 31.) In his affidavit, Detective Brenner explained that he found the Marino–Agnello "rent" conversation

> particularly telling, since Agnello does not own any property which is being used by MARINO and since the only meaning which 'rent' can have in the conversation between MARINO and Agnello is the monthly payment which MARINO would be making to Agnello as someone who works under his control as part of one of his illegal vehicle dismantling operations. Moreover, MARINO asking Agnello if he wants Alliance and Glen Cove is an indication that MARINO is seeking to help Agnello expand his client base for his newly opened scrap yard business.

(*Id.*) The government concedes that Detective Brenner's affidavit does not state the basis for his conclusion that Agnello did not own the property used by Marino, 150–06 or 150–10 Beaver Road. (Govt's Mem. at 18–19.) However, the government de-

tails the following research as the basis for Detective Brenner's statements:

> QDA Squad members investigated the matter and the conclusion that Agnello did not [own] the properties was amply supported. On January 25, 1996, well before Detective Brenner's affidavit, a computer check was done through "CityNet," which provides access to the records of the New York City Department of Finance. The CityNet check revealed that the address provided for Marino's Auto Salvage, 150–10 Beaver Road, was listed as having Block number 10107 and Lot number 82, and an owner named "Helene S. Yarkin." In addition, a check of 150–06 and 150–08 Beaver Road revealed that those addresses were not recognized by the New York City Department of Finance for taxation purposes.

(*Id.* at 19.) Based on information provided by the CI and his own observations, Detective Brenner concluded that Agnello had opened a new scrap metal business, and explained: "[b]ased on my expertise, I can state that it is likely that after expanding his client base for his scrap yard, he will intimidate his customers to continually patronize his business and will pay whatever price he chooses for the salvaged vehicles." (Brenner Aff. ¶ 31.)

Detective Brenner also explained that a conversation on April 17, 1996 between Marino and Agnello indicated that Marino was working under Agnello's control and that "the circumspect way in which they discussed matters ... indicates, in my expert opinion, that they are talking about matters which are illegal and which they do not want to discuss on the telephone." (*Id.* at ¶ 32.) The conversation, in relevant part, is as follows:

CM  Everything's alright?

CA  Yeah, any new faces?

CM I just seen your truck go over to Easy Does It. Does it to pick up his cars? Shakey said he's going to start coming by. He's gonna tell that other guy. I called Richie and Paulie. They said they get more money from Square Deal, so I wanted for you to handle that when you get back.

CA How much did he say he's getting?

CM He didn't say but I told him easy Charlie we'll get more, we don't pay for trucking so, I said all right when Carmine gets back I'll have him call you.

CA Tell him three and one quarter (3¼) I'll pick them up.

CM And you'll pick them up?

CA Yeah.

CM Okay.

CA He don't up more than that. I know that for a fact.

CM Okay, I'll call him back today and tell him that and I got to go over some shit with you when you get back.

CA You got those things?

CM That's what I want to go over with you.

CA You got them on your hands.

CM No, I don't, but the guy was here this morning. I thought you were coming back today. So I told him to come down here this morning.

CA How much you want for . . . ?

CM Whatever you want to do, he is over there by that Catallano Bakery with his son.

CA Yeah, what else?

CM That's it and that's it. There's some other shit we'll go over here when you come back.

(*Id.*) [13] In addition, Detective Brenner declared in his affidavit that in numerous conversations people called looking for Marino and were told that he was around the corner, "which is where Agnello is often staying at Jamaica Auto Salvage. Obviously, Marino has a reason to go and talk to Agnello in person rather that [*sic*] over the telephone, which he has shown a reluctance to talk freely over." (*Id.*)

Based on the interceptions from the May 3, 1996 extension, the QDA Squad expanded their surveillance on November 8, 1996, to include Agnello's cellular telephone line listed to Jamaica Auto Savings. (Fernich Aff. Ex. D.) Defendants argue that the May 3, 1996 eavesdropping warrant extension was invalid and, therefore, that · all further electronic surveillance based on this application should be suppressed. (Dfts.' Mem. at 8, 51.) Defendants contend that the application was based on false statements that were material to the probable cause determination because "public documents conclusively establish that Agnello owned the 150–06 Beaver Road property at the time of the May 1996 Affidavit." (Dfts.' Mem. at 2, 13.) They maintain that, had Detective Brenner conducted a proper investigation, he would have discovered Agnello to be the property's landlord, thereby making the conversations regarding "rent" unremarkable. (Dfts.' Mem. at 13.) They further argue that "Detective Brenner either recklessly failed to discover this public information or intentionally misled Justice O'Brien as to" the real nature of the "rent" conversations. (*Id.*) Defendants contend that Detective Brenner recklessly or intentionally omitted from the eavesdropping extension application any mention of Agnello's ownership of commercial properties in the Jamaica area, thus committing a *Franks* violation. (*Id.* at 24.) Finally,

---

**13.** Detective Brenner also described a conversation between Marino and Agnello on April 10, 1996, in which the men discussed matters in a circumspect manner, as also indicating that Marino worked under Agnello. (Brenner Aff. II ¶ 32.)

defendants argue that without the "rent" conversations the "May 1996 Affidavit failed to demonstrate that Agnello controlled the purported 'chop shop' ring, 'lacked probable cause' to name him or DECARLO as targets, and offered no basis to record their later conversations." (*Id.* at 32.)

The government responds that Detective Brenner's statements do not constitute a reckless disregard for the truth, since he was correct as to the ownership of the property. In the alternative, the government argues that the May 3, 1996 extension application contained sufficient probable cause to support the inclusion of Agnello and DeCarlo as subjects of the eavesdropping warrants even in the absence of the disputed "rent" conversation. (Govt's Mem. at 1.) The government maintains there is thus no basis for invalidating the telephone warrant and suppressing the resulting conversations. (*Id.*)

## DISCUSSION

The Supreme Court has established a two-pronged analysis for evaluating the underlying affidavit in support of a warrant. "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674; *United States v. Canfield*, 212 F.3d 713, 717–18 (2d Cir.2000). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Franks*, 438 U.S. at 171, 98 S.Ct. 2674. In addition,

[A]llegations of deliberate falsehood or of reckless disregard for the truth ... must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

*Id.*

■ The second prong of *Franks* requires the court to consider whether, after removing the false statement from the affidavit, there is sufficient basis for probable cause. *Franks*, 438 U.S. at 171–72, 98 S.Ct. 2674; *United States v. Trzaska*, 111 F.3d 1019, 1027–28 (2d Cir.1997); *see also United States v. Gotti*, 771 F.Supp. 535, 540 (E.D.N.Y.1991) ("the court must consider whether there was sufficient basis in the remainder of the ... affidavit upon which a neutral and detached magistrate could reasonably make a finding of probable cause"). However, the Second Circuit has also held that where the alleged inaccuracies are not material to the probable cause analysis, the court need not determine whether the statements were the result of the affiant's intentional falsehood or "reckless disregard for the truth." *Canfield*, 212 F.3d at 718. *See Canfield* 212 F.3d at 719–21 (after removal of faulty information from affidavit, probable cause existed because the information provided by the CI showed that the CI had a reasonable basis of knowledge and the CI's veracity was corroborated by the detective's investigation and information provided by a second CI). *See also United States v. Numisgroup Int'l Corp.*, 128 F.Supp.2d 136, 145 (E.D.N.Y.2000) (probable cause existed based on information

provided by victims during detective's investigation even in absence of the testimony of the CI).

■ "The fact that an innocent explanation may be consistent with the facts as alleged ... does not negate probable cause." *Fama,* 758 F.2d at 838. But, "[w]here a [judge] relies solely on the opinion of an agent as to the true meaning of facially innocent words, there may be an abdication of the judicial role . . . ." *United States v. Cancelmo,* 64 F.3d 804, 808 (2d Cir.1995). At the same time, "an agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application." *Fama,* 758 F.2d at 838. Thus, even where conversations may have an innocent meaning, an agent's interpretations are not necessarily "unreasonable or implausible." *Cancelmo,* 64 F.3d at 808.

### A. Probable Cause

■ [A] ... court may issue a wiretap order under 18 U.S.C. § 2518 if it determines, on the basis of the facts submitted by the applicant, that there is probable cause to believe (1) that an individual was committing, had committed, or is about to commit a crime; (2) that communications concerning that crime will be obtained through the wiretap; and (3) that the premises to be wiretapped were being used for criminal purposes or are about to be used or owned by the target of the wiretap.

*United States v. Diaz,* 176 F.3d 52, 110 (2d Cir.1999). The probable cause analysis requires the issuing judge to evaluate the totality of the circumstances and "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information,

there is a fair probability that ... evidence of a crime will be found." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Cancelmo,* 64 F.3d at 808. The same probable cause standard applies to both cavesdropping warrants and search warrants. *See Diaz,* 176 F.3d at 110.

Finally, "[a] reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists." *United States v. Wagner,* 989 F.2d 69, 72 (2d Cir.1993); *United States v. Gotti,* 42 F.Supp.2d 252, 261 (S.D.N.Y. 1999). "Any doubts as to the existence of probable cause should be resolved in favor of upholding the authorization." *United States v. Ambrosio,* 898 F.Supp. 177, 181 (S.D.N.Y.1995) (citing *Gates,* 462 U.S. at 237 n. 10, 103 S.Ct. 2317).

■ Viewing the eavesdropping warrant at issue in the totality of circumstances, I find that probable cause existed for the warrant, even without the disputed "rent" conversations. The May 1996 extension of the eavesdropping warrant incorporates by reference all of the previous warrants, beginning with the first application in February 1996. As an initial matter, the government points out that the Marino telephone was not located at Marino's Auto Salvage where it was registered, at 150–10 Beaver Road, but rather was inside Beaver Auto Parts at 150–06 Beaver Road. (Transcript of Motion Before Judge Robert M. Levy, dated May 24, 2001 ("Tr.") at 16.) As the government notes, this supports the inference of an attempt at "obfuscation on the part of Charlie Marino ... to confuse the police." (*Id.*)

Before the May extension, Agnello appeared in the applications supporting the eavesdropping warrant and its ex-

tensions.[14] Pen registers show many telephone calls between Marino's and Agnello's businesses thus indicating a link between the businesses. (Govt's Mem. at 10.) The CI had also informed the QDA Squad about Marino's involvement in an illegal dismantling enterprise. Agnello also had a criminal history including violations of vehicle dismantler registrations suggesting involvement in activities of a nature similar to the conduct alleged in this case. Detective Brenner further learned from the CI that Agnello had an illegal dismantling business and that Marino worked under him. Through surveillance, Brenner confirmed the CI's report that Marino ran a chop shop that accepted insurance jobs. For example, on one occasion Brenner observed a dismantled, stolen vehicle containing paperwork from Marino's parked outside Marino's. (Brenner Aff. I ¶¶ 28–34.) In reviewing probable cause based on information provided by a CI, "[i]f a substantial amount of information from an informant is shown to be reliable because of independent corroboration, then it is a permissible inference that the in-

formant is reliable and that therefore other information that he provides, though uncorroborated, is also reliable." *Wagner*, 989 F.2d at 73. Based on the information submitted in the May 3, 1996 eavesdropping extension application, Justice O'Brien could reasonably have concluded that the CI was reliable.

Detective Brenner's own expertise in investigating auto crimes and his testimony as to Agnello's role in controlling the vehicle dismantling operation further reinforces the probable cause analysis. It is well established that the "agent's expert opinion is an important factor to be considered by the judge in reviewing a warrant application." *Fama*, 758 F.2d at 838.[15]

Next, the May 1996 affidavit details conversations between and among Marino, Perry, Scruggs, and Agnello regarding the running of two license plates. Defendants contend that the plate runs do not relate to the illegal dismantling business. They point out that no stolen cars turned up and argue that Agnello was simply checking the plate of a suspicious car outside of his own house, which was revealed to be a police car. (Tr. at 41–42, 47.)

---

**14.** Among the evidence on which the government relies is a February 26, 1996 conversation between Agnello and Marino, which, according to the government, illustrates Agnello's violent nature and his exertion of control over rivals, and demonstrates that Marino worked under Agnello in Agnello's vehicle theft and illegal dismantling enterprise. (Govt's Mem. at 13.) The government argues that in this conversation, which is described more fully above (*see supra* n. 6), "Agnello enlisted Marino to call a rival business and issue a threat from Agnello." (Govt's Mem. at 46.) The court was not supplied with the March 1996 Brenner Affidavit and therefore is hard-pressed to evaluate the government's claims. Regardless, this conversation is not necessary to the court's probable cause finding, as other evidence provides sufficient basis for the eavesdropping warrant.

**15.** Defendants note that the QDA Squad was aware of ties between Agnello and Marino at the time of the first wiretap application in March 1996 and argue that "the fact that Agnello was not named as a subject at that time proves that probable cause was lacking." (Reply Memorandum of Law in Further Support of Defendants' Joint Franks Motion, dated May 14, 2001 ("Dfts.' Reply Mem.") at 13–14.) However, the fact that Agnello was not named as a target until May 1996 suggests that the government waited until it was satisfied that there was sufficient evidence to establish probable cause before adding him as a target of the wiretap. The government's diligence does not serve as a basis for invalidating probable cause.

The court need not determine whether defendants have offered a convincing explanation for defendants' conduct. "[T]he fact that an innocent explanation" may exist for these facts "does not negate probable cause." *Fama*, 758 F.2d at 838. Although information in a warrant application must be truthful, "[t]his does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct," but rather " 'truthful' in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Franks*, 438 U.S. at 165, 98 S.Ct. 2674.[16] The issue is not whether, after the fact, defendants can provide an innocent explanation for these conversations, but whether the detective reasonably or appropriately believed that the defendants were discussing plate runs in furtherance of the vehicle dismantling business and whether these facts provided evidence for the "totality of circumstances" test required in making a probable cause determination. Here, Detective Brenner obtained evidence of the defendants running license plates on an NYPD computer. Nothing in the transcript suggests that Agnello's request to illegally access a police computer was unique or out of the ordinary. Marino treated these requests as uneventful, using an established procedure which included a contact in the NYPD. He expressed no surprise that the request came from Agnello, who appeared familiar with the procedure. Based on the evidence obtained through this investigation and Brenner's specialized training and experience, I find that Brenner reasonably believed Agnello's requests to run license plates were in furtherance of the illegal dismantling business. (Brenner Aff. II ¶ 27.)

Defendants assert that Detective Brenner did not contend in his affidavit that the conversations about license plates established probable cause to name Agnello or DeCarlo as chop shop targets and argue that Brenner "did not rely on these conversations to show prospective probable cause." (Dfts.' Mem. at 48–49.) This argument is inapposite. In his affidavit, Brenner expressly stated that these conversations were "in furtherance of an illegal theft and dismantling enterprise" and that in his opinion "the reason for running plate numbers ... is to determine whether 'insurance job' or stolen vehicles have been reported stolen yet or to determine whether there is an undercover police vehicle in the vicinity." (Brenner Aff. II at ¶ 27.) It is clear from these statements that Detective Brenner relied on the license plate conversations both to establish probable cause as to the computer trespass crimes and to name Agnello and DeCarlo as targets of the investigation. Moreover, it is reasonable to conclude that Justice O'Brien relied upon these conversations in finding probable cause to extend the eavesdropping warrants to include Agnello and DeCarlo.

■ Based on information provided by the CI Detective, Brenner reasonably believed that Agnello controlled an illegal vehicle dismantling operation in which Marino participated and that DeCarlo worked for Agnello running the day-to-day business. (Brenner Aff. II at ¶ 29.) This belief was further reinforced by conversations intercepted between Marino and Agnello. For example, on April 11, 1996 Marino asked Agnello "you want Alliance

---

**16.** *See also United States v. Zagari,* 111 F.3d 307, 318–19, 321–22 (2d Cir.1997) (agent's failure to fully explore and investigate psychological background of informant who had a history of insanity did not necessitate a hear-ing under *Franks*. The agent "made no claim that he attempted to verify [the informant's] general credibility by conducting a complete investigation into his past").

and Glen Cove?" and Agnello responded "yeah, why not?" (Brenner Aff. II ¶ 31). Detective Brenner interpreted this conversation as an indication that Marino was helping Agnello expand his client base for the new scrap yard business. (*Id.*) On April 17, 1996, Marino informed Agnello that "Richie and Paulie" were going to take their business elsewhere because they could get more money from "Square Deal." Marino told "Richie and Paulie" to talk to Agnello, and Agnello then instructed Marino what to say to "Richie and Paulie." (*Id.* at ¶ 32.) These are not the usual conversations of two friends or the dealings of a landlord and his tenant. The tenor of these conversations suggests that Marino worked underneath Agnello and took instruction from him. (Govt's Mem. at 48–49.) In addition, Agnello and Marino typically spoke in a circumspect manner as if trying to avoid detection. For example, Agnello cryptically asked "you got those things?" and Marino responded "that's what I want to go over with you." (Brenner Aff II ¶ 32.) Their elliptical statements clearly suggest that the two men were working together on matters too

sensitive to discuss on the telephone. Finally, the May 3, 1996 extension application includes numerous instances where callers asked for Marino and were told he was around the corner, presumably at Agnello's business, thus further suggesting business ties between Marino and Agnello.[17]

This court concludes that probable cause existed for the May 1996 eavesdropping warrant extension because conversations linked Marino to Agnello and the evidence sufficiently showed that Marino and Agnello were working together in an illegal dismantling business. DeCarlo, who essentially acted as Agnello's business manager, had moved into the location of the Marino business. Further, Detective Brenner had corroborated the CI's information and thus found him to be reliable. Finally, Agnello had asked Marino to conduct illegal license plate runs, thereby suggesting illegal activity. Accordingly, there was probable cause for the warrant, whether this court reviews the application de novo or gives Justice O'Brien's original probable cause determination the deference to which it is entitled. *See Wagner*, 989 F.2d at 72.

**17.** In addition, Detective Brenner stated, based on his investigation and knowledge of these illegal businesses, that he found it likely that Agnello would intimidate potential scrap yard customers in the future. (Brenner Aff. II at ¶ 31.) Defendants characterize Detective Brenner's prediction as mere speculation and argue that "an agent's bald conjecture, investigative hunches and 'unsubstantiated assertion[s],' do not suffice to establish probable cause." (Dfts.' Mem. at 35 (citations omitted).) Defendants argue that no illegal activity was discussed in the conversation on April 17, 1996, which Detective Brenner interpreted as indicating that "Marino is working under Agnello." (Brenner Aff. II ¶ 32.) They further assert that "[c]ontrary to Detective Brenner's interpretation, the conversation merely suggests that MARINO may have worked with—not 'under'—AGNELLO in connection with certain business ventures." (Dfts. Mem. at 37.) Defendants also suggest

that the apparent desire to avoid conversations via the telephone and discuss illegal matters in person is also "rank 'speculation'" (*Id.* at 39.)

However, as explained above, probable cause requires the court to consider the "totality of the circumstances." Probable cause will be found to exist when sufficient information indicates there is a "probability" that criminal conduct is occurring or about to occur. *See Gates*, 462 U.S. at 238, 103 S.Ct. 2317; *Diaz*, 176 F.3d at 110. Even without Brenner's prediction of future intimidations, these conversations corroborate Agnello's and Marino's involvement in a business that Agnello controlled, and that could not be discussed openly on the telephone. However, as explained above, the Second Circuit has noted that an "agent's expert opinion is an important factor to be considered." *Fama*, 758 F.2d at 838.

Defendants make much of the conversations about "rent" and argue, at great length, that Agnello owned 150–06 Beaver Road, the property discussed in the conversation. Further, they maintain that Detective Brenner's failure to inform the issuing judge of Agnello's ownership of 150–06 Beaver Road rises to the level of an intentional falsehood or "reckless disregard for the truth." It is not necessary to evaluate the veracity of the statements regarding Agnello's property ownership because probable cause exists in the absence of the "rent" conversations.[18] Having reviewed the Brenner affidavits, I find sufficient probable cause existed for the third extension for the Marino eavesdropping application, and I respectfully recommend that defendants' request for a *Franks* hearing and motion to suppress

electronic surveillance recordings be denied.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the motion to suppress electronic surveillance and the request for a Franks hearing be denied. Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with courtesy copies to Judge Gershon and to my chambers, within ten (10) business days. Failure to file objections within the specified time waives the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1).

---

**18.** The court does not reach the issue as to whether defendants have made a substantial preliminary showing that Detective Brenner's representations in his May 1996 affidavit rise to the level of a "deliberate falsehood or reckless disregard for the truth." *Canfield,* 212 F.3d at 717–18. However, this court's review of defendants' submissions suggests that they have not met their burden. First, the documents submitted do not establish that Agnello owned 150–06 Beaver Road. For example, the 1996 Department of Finance records show that Agnello owned 150–04 Beaver Road, Helene Yarkin owned 150–10 Beaver Road, and no listing existed for 150–06 or 150–08 Beaver Road. (Fernich Aff., Exs. E, G.) Both the QDA Squad and this court discovered the same information in their searches of the Department of Finance Records. The deed provided by defendants makes no mention of the street address connected to Lot 79, Block 10107, which is owned by Agnello. (Fernich Aff., Ex. E.) The only mention of a relationship between Lot 79 and 150–06 Beaver Road can be found in New York City Building Department records, such as the Public Access Property Profile Overview, the Certificate of Occupancy from 1996, and the papers filed by architect Robert Palermo regarding a change in the certificate of occupancy in 1995. (Fernich Aff., Exs. E–F; Affidavit of Marc Fernich dated May 14, 2001, Exs. A, B.) However, the

court was provided with no information as to how the Building Department generated these records and is therefore unable to evaluate them fully.

In any case, Detective Brenner, even if mistaken, could reasonably have believed, based on the research of the QDA Squad, that Agnello did not own the property occupied by Marino at 150–06 Beaver Road. Defendants have not demonstrated that any shortcomings in Detective Brenner's research or statements in the May 1996 affidavit rise to the level of a knowing and intentional falsehood or reckless disregard for the truth. Failure to fully investigate all of the underlying facts relied upon in an affidavit does not rise to the level of a *Franks* violation as long as the failure did not amount to a reckless disregard for the truth. *See Zagari,* 111 F.3d at 318–19, 321–22; *United States v. Millar,* 79 F.3d 338, 342–43 (2d Cir.1996) (affidavit's mistake as to how defendant paid for car was not a *Franks* violation because there was no evidence of "deliberate prevarication"); *United States v. Meling,* 47 F.3d 1546, 1553–54 (9th Cir.1995) (FBI's reliance on defendant's rap sheet without conducting a more thorough investigation of informant, as to whom public records would have revealed a recent conviction and confinement on three occasions to a mental institution, "fell far short of reckless disregard of the truth").