# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3903

_____

United States of America,          *
                                    *
    Plaintiff - Appellee,          *
                                    *    Appeal from the United States
v.                                  *    District Court for the
                                    *    District of Minnesota.
Mohammed Ahmed Kattaria,            *
                                    *
    Defendant - Appellant.         *

_____

Submitted:  May 14, 2007
Filed:  October 5, 2007

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON and WOLLMAN, Circuit Judges.

_____

LOKEN, Chief Judge.

A state court warrant authorized aerial use of a thermal imaging device to search for excess heat emanating from a home owned by Mohammed Kattaria. Subsequent warrant searches of the home and two others owned by Kattaria uncovered two marijuana grow operations.  Kattaria conditionally pleaded guilty to conspiracy to manufacture, distribute, and possess with intent to distribute fifty or more marijuana plants in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846 after the magistrate judge[1] recommended denying his motion to suppress and the district

_____

[1]The HONORABLE ARTHUR J. BOYLAN, United States Magistrate Judge for the District of Minnesota.

court[2] accepted that recommendation. Kattaria appeals the denial of his motion to suppress. In his reply brief, he challenges the magistrate judge's denial of his motion for a <u>Franks</u> hearing, an issue he neither properly preserved in the district court nor timely raised on appeal. Finally, he argues that his 98-month sentence was unreasonable despite an advisory guidelines range of 151 to 188 months. We affirm.

## I. The Warrant Searches

On May 6, 2004, Special Agent Michael Perry of the Minnesota Bureau of Criminal Apprehension applied to Ramsey County District Court for a warrant authorizing aerial use of a thermal imaging device to measure heat emitting from the home at 1814 Malvern Street in Lauderdale, Minnesota. Perry's supporting affidavit averred that in late March a cooperating defendant (CD) described Kattaria, identified his photo, said they had occasionally smoked marijuana over the past ten years, and knew Kattaria had a criminal history. The CD said that in 2002 he observed a marijuana grow operation in the basement of the home Kattaria owned at 1814 Malvern. Perry averred that a criminal records check revealed a 1997 conviction and a 2000 arrest for marijuana offenses. A check of utility company records revealed that electric power consumption at 1814 Malvern ranged from 1890 to 2213 kilowatt hours per month from November 2003 through April 2004, whereas consumption ranged from 63 to 811 kilowatt hours per month at five nearby residences. Finally, Perry averred that he drove by the residence several times, observing drawn blinds and nothing that would draw large amounts of electricity. A District Court judge issued a warrant authorizing a nighttime search for "[a]n excess amount of heat emitting from the residence and garage relative to comparable structure[s] in the same neighborhood."

---

[2]The HONORABLE DONOVAN W. FRANK, United States District Judge for the District of Minnesota

The warrant was executed on May 7, 2004. The experienced thermal imaging operator concluded that the property emitted heat consistent with indoor marijuana grow operations. Perry then applied to Ramsey County District Court for two warrants to conduct physical searches at 1814 Malvern and at another property owned by Kattaria in Falcon Heights, Minnesota. In addition, an investigator applied to Anoka County District Court for a warrant to conduct a physical search at a third home in Lino Lakes, submitting an affidavit based upon information supplied by Special Agent Perry. The supporting affidavits for these warrants included the results of the thermal imaging at 1814 Malvern, the facts set forth in Perry's first affidavit, additional information regarding the CD's reliability, the quantities of marijuana Kattaria possessed when arrested twice in 1997, information regarding Kattaria's wage earnings and expenses purchasing the properties, electric power consumption data for the Lino Lakes and Falcon Heights properties, and information from a concerned citizen that no one appeared to be living at the Lino Lakes residence or using electricity in the evenings. The warrants issued. The three warrant searches yielded 548 marijuana plants, bags of marijuana, and other incriminating evidence.

Kattaria argues that the district court erred in concluding that the warrant to conduct a thermal imaging search was supported by probable cause because there was no statement as to the CD's reliability, the CD's observation of a grow operation in the basement two years earlier was uncorroborated stale information, and Perry's affidavit included inaccurate information such as averring that Kattaria had a prior firearm conviction.[3] He further argues the subsequent warrants lacked probable cause for the same reasons, and because the results of the thermal imaging were unconstitutionally obtained and therefore may not be considered. He concludes that,

---

[3]Kattaria's reply brief acknowledges the electric power consumption data contained in the affidavit but argues Perry violated state law in obtaining this data from the electric utility. This issue was not timely raised, and we decline to consider it. See United States v. Thornberg, 326 F.3d 1023, 1025-26 n.3 (8th Cir. 2003).

when stale information, inaccurate information, and information from an unreliable informant are removed, probable cause is lacking to support all four affidavits.

## A.

Kattaria's attack on all four warrants assumes that the first warrant to conduct a limited aerial thermal imaging search violated the Fourth Amendment unless supported by traditional probable cause. The Supreme Court first held that a warrant is required before conducting this type of search in Kyllo v. United States, 533 U.S. 27 (2001). The Court concluded that, when "the Government uses a device that is not in general public use, to explore details of the home that would previously have been unknowable without physical intrusion, the surveillance is a 'search' and is presumptively unreasonable without a warrant." Id. at 40.

The Court in Kyllo did not discuss what showing is constitutionally required to obtain a warrant to conduct a thermal imaging search. But the Court has often discussed this issue in other contexts:

> The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, in certain limited circumstances neither is required. . . . Where a careful balancing of governmental and private interests suggests that the public interest is best served by a Fourth Amendment standard of reasonableness that stops short of probable cause, we have not hesitated to adopt such a standard.

New Jersey v. T.L.O., 469 U.S. 325, 340-41 (1985) (quotation omitted); see United States v. Montoya de Hernandez, 473 U.S. 531, 537-41 (1985), and cases cited. For example, the Court has upheld administrative warrants as reasonable without a

showing of probable cause in various contexts.  See United States v. Lucas, No. 05-2165, slip op. at 8-9 (8th Cir. Aug. 23, 2007) (en banc) (collecting cases).[4]

In an analogous investigative context, the traditional requirement of probable cause is relaxed by the well-established Fourth Amendment principle that the police may reasonably make a brief and minimally intrusive investigative stop if they have reasonable suspicion that criminal activity may be afoot.  As the Supreme Court explained in United States v. Brignoni-Ponce, 422 U.S. 873, 881 (1975):

> These cases [Terry v. Ohio, 392 U.S. 1 (1968), and Adams v. Williams, 407 U.S. 143 (1972)] together establish that in appropriate circumstances the Fourth Amendment allows a properly limited "search" or "seizure" on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime. . . .  The limited searches and seizures in those cases were a valid method of protecting the public and preventing crime.

Factors cited as justifying application of this standard, rather than probable cause, were "the importance of the governmental interest at stake, the minimal intrusion of a brief stop, and the absence of practical alternatives."  422 U.S. at 881.

---

[4]Since Kyllo, few reported cases have involved warrants issued to conduct thermal imaging searches.  In United States v. Huggins, 299 F.3d 1039, 1044 n.5 (9th Cir.), cert. denied, 537 U.S. 1072 (2002), the court observed with little analysis that "the quantum of probable cause necessary to justify a thermal imaging search does not differ from that necessary to justify a physical search."  However, concluding that the officers relied on the warrant in good faith, the court denied a motion to suppress the resulting thermal images.  299 F.3d at 1046-47.  The Sixth Circuit likewise applied the Leon good faith exception in an unpublished opinion, United States v. Jarrell, 68 Fed. App'x 622, 625-27 (6th Cir.), cert. denied, 540 U.S. 1005 (2003).  Even if frequently invoked, the good faith exception seems an unsatisfactory answer to the underlying issue.

The four dissenters in <u>Kyllo</u> argued that using a thermal imaging device to monitor heat emissions from a private residence "is an entirely reasonable public service," and "the countervailing privacy interest is at best trivial." 533 U.S. at 45 (Stevens, J., dissenting). The majority rejected this analytical approach in deciding whether a warrant is constitutionally required. Expressing concern about the potential invasiveness of future technology, the majority drew a bright line, requiring a warrant for the use of non-public technology, regardless of the type of information being gathered from inside the home. <u>Id.</u> at 40.

In our view, the "practical alternatives" factor provides good reason to shift the analysis when the issue is the quantum of evidence required to obtain a warrant *solely for the purpose of conducting investigative thermal imaging*. Special Agent Perry wished to conduct thermal imaging to investigate a suspected indoor marijuana grow operation. When the thermal imaging results confirmed the probable presence of an indoor grow operation, Perry applied for three warrants to conduct far more intrusive physical searches of Kattaria's properties. His supporting affidavits included the thermal imaging results from 1814 Malvern and additional facts from Perry's on-going investigation. This is a constitutionally reasonable investigative sequence. It provides important corroboration that criminal activity is likely being conducted in a home *before the homeowner is subjected to a full physical search.* If the same probable cause is required to obtain both kinds of warrants, law enforcement will have little incentive to incur the expense of a minimally intrusive thermal imaging search before conducting a highly intrusive physical search.

For these reasons, we are inclined to believe that the same Fourth Amendment reasonable suspicion standard that applies to <u>Terry</u> investigative stops should apply to the issuance of a purely investigative warrant to conduct a limited thermal imaging search from well outside the home. Applying that standard, the first warrant was clearly valid, taking into account what the CD told Special Agent Perry, Kattaria's criminal history, and, most significantly, utility records showing extremely high

relative electric consumption that was not explained by what Perry could observe when he drove by the 1814 Malvern residence several times.

**B.**

Alternatively, we agree with the district court that the thermal imaging warrant was supported by probable cause, that is, "a fair probability that contraband or evidence of a crime will be found in the location to be searched." United States v. LaMorie, 100 F.3d 547, 552 (8th Cir. 1996). To be sure, the CD's information was rather stale when Perry submitted his warrant affidavit in May 2004, particularly the CD observing a grow operation in the basement two years earlier. But this information served as the impetus for further investigation by Special Agent Perry. The check of Kattaria's criminal history provided some corroboration, and recent utility records provided significant evidence that the CD's report of illegal drug activity in the home was continuing in nature. "The passage of time is less significant when there is cause to suspect continuing criminal activity. . . . [W]here recent information corroborates otherwise stale information, probable cause may be found." United States v. Ozar, 50 F.3d 1440, 1446 (8th Cir.), cert. denied, 516 U.S. 871 (1995) (quotation omitted). Corroboration from facts such as increased electrical usage may compensate for lack of information about an informant's reliability or the basis of his knowledge. See United States v. Olson, 21 F.3d 847, 850 (8th Cir.), cert. denied, 513 U.S. 888 (1994).

Our duty as a reviewing court "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983) (quotation omitted). Like the district court, we conclude that Special Agent Perry's supporting affidavit provided probable cause to issue the initial thermal imaging warrant. The affidavits supporting the three later warrants, which included the thermal imaging results from 1814 Malvern and additional facts obtained

-7-

by Perry's investigation, likewise provided sufficient probable cause to issue warrants authorizing physical searches of Kattaria's homes.

## II.  Denial of a <u>Franks</u> Hearing

In the district court, Kattaria filed both a motion to suppress and a separate motion for a <u>Franks</u> hearing.  "A defendant is entitled to such a hearing if he 'makes a substantial preliminary showing that a false statement was knowingly and intentionally, or with reckless disregard for the truth, included by the affiant in the warrant affidavit,' and 'the allegedly false statement is necessary to the finding of probable cause.'"  <u>United States v. Timley</u>, 443 F.3d 615, 623 (8th Cir.), <u>cert. denied</u>, 127 S. Ct. 299 (2006), quoting <u>Franks v. Delaware</u>, 438 U.S. 154, 155-56 (1978).

Both motions were initially heard by the magistrate judge, who issued an Order denying the motion for a <u>Franks</u> hearing and a Report and Recommendation that the district court deny the motion to suppress.  <u>See</u> 28 U.S.C. § 636(b)(1)(A), which authorizes a district judge to "designate a magistrate judge to hear and determine any pretrial matter pending before the court, except a motion . . . to suppress evidence in a criminal case . . . ."  The statute provides that "[e]ach district court shall establish rules pursuant to which the magistrate judges shall discharge their duties." § 636(b)(4).  District of Minnesota Local Rule 72.1(b)(2) provides that a party may appeal from a magistrate judge's order by timely filing and serving a written *notice of appeal.*  By contrast, a party who objects to a proposed report and recommendation must timely file *written objections.*  D. Minn. LR 72.1(c)(2).

Here, in response to the magistrate judge's rulings, Kattaria filed only "Objections to the Report and Recommendation."  He did not appeal the Order denying his motion for a <u>Franks</u> hearing, and the district court did not review that Order.  Thus, he did not preserve this issue for appeal.  Moreover, he first argued that the district court abused its discretion in denying a <u>Franks</u> hearing in his reply brief.

Therefore, the issue was not timely raised on appeal. For both reasons, we decline to consider it.

## III. The Sentencing Issue

The district court determined that as a career offender Kattaria's total offense level was 29 and his criminal history category was VI, which produced an advisory guidelines range of 151-188 months. This determination is not disputed. The district court then granted a 53 month downward variance based primarily on the court's view of "the nature of the controlled substance offenses that led to the career offender classification and also the frequency with which they occurred." On appeal, Kattaria argues that the resulting 98-month sentence is unreasonably harsh because he pleaded guilty to a non-violent offense that ended in 2001, he has in recent years been employed sixty hours per week, and many family, friends, and colleagues wrote to the district court urging a more lenient sentence.

We review the reasonableness of a sentence for abuse of discretion. When the district court varies from the advisory guidelines range based on the sentencing factors in 18 U.S.C. § 3553(a), we consider whether both the decision to grant a variance and the extent of the variance are reasonable. See United States v. Beal, 463 F.3d 834, 836 (8th Cir.), pet'n for cert. filed, No. 06-8498 (U.S. Dec. 21, 2006). Here, it was not unreasonable for the district court to vary downward by 53 months based primarily on the nature and frequency of the prior convictions that made Kattaria a career offender and thereby increased his advisory guidelines range by some 100 months. After careful review of the entire record, we conclude that it was not unreasonable for the court to deny the further downward variance Kattaria requested.

The judgment of the district court is affirmed.

_____